IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, ) | |
| ) | |
| *Plaintiff*, ) | No. 13 CR 949 |
| V. ) | |
| ) | Hon. Virginia M. Kendall |
| MARVIN T. BELL, MONICA HER- ) | |
| NANDEZ, and CARLOS RAYAS, ) | |
| ) | |
| *Defendants*. ) | |

## MEMORANDUM OPINION AND ORDER

On December 11, 2013, a grand jury indicted Defendants Melvin Bell and Monica Hernandez with four counts of mail fraud (Counts I–IV) and Defendant Carlos Rayas with two counts of mail fraud (Counts I and IV), all in violation of 18 U.S.C. § 1341. (Dkt. 2). On January 20, 2017, Defendant Rayas pled guilty to Count IV. (Dkts. 336–37). On February 1, 2017, a jury found Defendants Bell and Hernandez each guilty on three counts of mail fraud. (Dkts. 350–353). Defendant Bell filed a Motion for Judgment of Acquittal on all three counts under Federal Rule of Criminal Procedure 29. (Dkt. 476). For the following reasons, Defendant Bell's Motion (Dkt. 476) is denied.

## BACKGROUND

The Indictment alleged that Bell, Hernandez, and Rayas ("Defendants") participated in a scheme beginning in October 2011 and continuing through 2013 in which they falsely marketed Washington National Trust as a trust operated and controlled by wealthy Native Americans who provided financial assistance to homeowners facing foreclosure of their homes. (*Id.* at ¶¶ 3–4).

Specifically, the Government charged that Defendants falsely represented to homeowners that in exchange for fees ranging from $5,000 to $10,000, WNT would lower their mortgages

and/or defeat foreclosure by purchasing their mortgages from the lender, applying the fees paid to WNT by the homeowners to the principal balance, and then charging the homeowners only half of their original mortgage to be paid over five years free of any interest and taxes. (*Id.* at ¶¶ 6–8). The Indictment further alleged that Defendants directed homeowners to sign documents and deeds purportedly transferring title to WNT and assigning WNT as their trustee and then mailed the new members signed copies of these membership documents knowing the documents would have no effect on the foreclosure process and were designed only to make WNT appear legitimate. (*Id.* at ¶¶ 9–10). In fact, WNT did not have sufficient funds to purchase any homeowner's mortgage and never did so, and instead used the homeowners' fees for personal expenses, WNT operations, and referral fees paid to individuals who referred additional homeowners to WNT. (*Id.* at ¶¶ 13–15). Defendants concealed all of this from homeowners, as well as the fact that in December 2012 the Illinois Department of Financial and Professional Regulation (IDFPR) ordered WNT to cease and desist using the word "trust" when conducting business in Illinois and in February 2013 revoked Rayas' mortgage loan originator license and ordered Bell and Hernandez to cease and desist engaging in unlawful residential mortgage origination activity in Illinois. (*Id.* at ¶¶ 18–21).

Each of the four counts charged in the Indictment corresponds to a separate mailing of membership documents, alleging that on a specific date—April 11, 2012, August 8, 2012, September 6, 2012, and September 7, 2012—Defendants:

> for purpose of executing the scheme to defraud, knowingly caused to be delivered by U.S. mail, according to the direction thereon, an envelope containing signed copies of membership documents from WNT to [a member in Illinois].

(*Id.* at Counts I-IV). The four individual victims were later identified as Rafael Ramirez, Cuahtemoc Lopez, Adan Tapia, and Blanca Gonzalez. The Government eventually dropped the charge based on the mailing to Tapia. On January 20, 2017, Rayas pled guilty to one of the charges of mail fraud against him. (Dkt. 337).

The Court held a jury trial from January 25, 2017 to February 1, 2017 on the remaining three charges against Bell and Hernandez. The jury heard from several witnesses including Ramirez, Lopez, Tapia, Gonzalez and other victims of Defendants' scheme; WNT employees; the IDFPR employee who handled the investigation into WNT; and the auditor with the U.S. Attorney's Office who investigated WNT's finances. The Government also introduced a number of exhibits including the membership packets mailed to Ramirez, Lopez, and Gonzalez; more than 60 folders of WNT records including outgoing mail maintained by Hernandez; and WNT financial records.

The jury judged the credibility of the witnesses, weighed the evidence, and found Bell and Hernandez guilty on three counts of mail fraud. Bell now moves for acquittal and claims the Government did not meet its burden of proof on the element that he caused the U.S. Postal Service to deliver mail "for the purpose of executing the scheme."

## **LEGAL STANDARD**

Federal Rule of Criminal Procedure 29(a) provides that "the court on the defendant's motion must enter a judgment of acquittal on any offense for which the evidence is insufficient to sustain a conviction." Fed. R. Crim. P. 29(a). "In challenging the sufficiency of the evidence, [the defendant] bears a heavy, indeed, nearly insurmountable, burden." *United States v. Warren*, 593 F.3d 540, 546 (7th Cir. 2010). The defendant "must convince [the court] that even after viewing the evidence in the light most favorable to the prosecution, no rational trier of fact could have found him guilty beyond a reasonable doubt." *Id.* (quoting *United States v. Woods*, 556 F.3d 616, 621 (7th Cir. 2009)). In other words, a court will "set aside a jury's guilty verdict only if the record contains no evidence, regardless of how it is weighed, from which a jury could have returned a conviction." *United States v. Presbitero*, 569 F.3d 691, 704 (7th Cir. 2009); *see also United States*

*v. Chhibber*, 741 F.3d 852, 858 (7th Cir. 2014) (The Court "will overturn a verdict for insufficiency of the evidence only if, after viewing the evidence in the light most favorable to the government, the record is devoid of evidence from which a rational trier of fact could find guilt beyond a reasonable doubt."). The jury must weigh the evidence and assess the witnesses' credibility and courts do not "second-guess the jury's assessment of the evidence." *United States v. Rollins*, 544 F.3d 820, 835 (7th Cir. 2008); *see also Warren*, 593 F.3d at 547 ("Sorting the facts and inferences is a task for the jury."). If "there is a reasonable basis in the record for the verdict, it must stand." *United States v. Moshiri*, 858 F.3d 1077, 1082 (7th Cir. 2017).

## **DISCUSSION**

Bell argues that the Court should enter a judgment of acquittal under Rule 29 for each count because the Government failed to present evidence that he caused the U.S. Postal Service to deliver mail for the purpose of executing the scheme. Bell argues that because the scheme was completed in person before any mailings were sent, the subsequent mailings could not have furthered the scheme and, in fact, only hastened the detection of the scheme. (Dkt. 476.) Because there is ample evidence in the record to support the jury's verdict, Bell is not entitled to relief.

The jury found Bell guilty of three counts of mail fraud under 18 U.S.C. § 1341. To sustain a mail fraud conviction under 18 U.S.C. § 1341, the government must prove three elements: (1) the defendant's participation in a scheme to defraud; (2) defendant's commission of the act with intent to defraud; and (3) use of the mails in furtherance of the fraudulent scheme. *See United States v. Jackson*, 546 F.3d 801, 810 (7th Cir. 2008); *United States v. Walker*, 9 F.3d 1245, 1249 (7th Cir. 1993). Bell argues the Government failed to introduce sufficient evidence at trial to prove the third element—that the use of mails furthered the scheme—beyond a reasonable doubt.

The mail fraud statute is not intended to reach all frauds but only those in which the use of the mails is part of the scheme. *See United States v. Turner*, 551 F.3d 657, 666 (7th Cir. 2008)[1] (citing *Schmuck v. United States*, 489 U.S. 705, 710 (1989)). The use of the mail "need not be an indispensable part of the fraud to satisfy the 'in furtherance of' element of the offense; it need only 'be incident to an essential part of the scheme . . . or a step in [the] plot.'" *Id.* (quoting *Schmuck*, 489 U.S. at 710–11)). "In other words, the success of the scheme must in some measure depend on the mailing." *Id.* (citing *United States v. Seward*, 272 F.3d 831, 836 (7th Cir.2001)). Additionally, the defendant need not have personally caused the use of the mail; "it is enough that the use of mail . . . 'will follow in the ordinary course of business, or where such use can reasonably be foreseen, even though not actually intended.'" *Id.* (quoting *Pereira v. United States*, 347 U.S. 1, 8–9 (1954)). Finally, the mailing "need not itself contain false or fraudulent material"; a "routine or innocent" mailing can satisfy the third element of the offense so long as it "is part of the execution of the scheme." *Id.* (citations omitted).

Bell argues the Government introduced no evidence to show that he caused the U.S. Postal Service to deliver mail "for the purpose of executing the scheme." (Dkt. 476 at 1). Bell makes much of the fact that the victims of the scheme each testified that his or her deal with WNT was completed upon signing the membership documents, and that the mailings were only sent after that. (*See* Dkt. 476 at 2-4.) According to Bell, because the agreements were completed (and thus the scheme completed in his mind) in person before any mailings were sent, the government was required to show that the mailings "facilitate[d] concealment of the scheme" or "were designed to

---

[1] *Turner* dealt with both the mail fraud and wire fraud statutes. These statutes—18 U.S.C. § 1341 and § 1341, respectively—are worded almost identically. Therefore, "[c]ases construing the mail-fraud statute are equally applicable to cases involving violations of the wire-fraud statute," and vice versa. *Turner*, 551 F.3d at 666, n.4 (citing *United States v. Leahy*, 464 F.3d 773, 786 (7th Cir. 2006)); *see also United States v. Dooley*, 578 F.3d 582, 587, n.2 (7th Cir. 2009).

lull the victims into a false sense of security" and failed to do so. *Id.* at 2 (quoting *United States v. Best*, 660 F. Supp. 371, 373 (N.D. Ill. 1987). Ramirez, Lopez, and Gonzalez each testified that they understood their deal with WNT to be complete upon signing an agreement at WNT's office. (*See, e.g.*, Dkt. 409 at 769:18–21 (Defense counsel: "But at the time that you signed the documents in person at Washington National Trust, your agreement with Washington National Trust was complete, correct?" Ramirez: "As I understood it.")). But the members' understanding of the scheme is just one piece of evidence presented to the jury and, regardless, is by no means dispositive of whether the "in furtherance" element was met for purposes of the mail fraud statute.

The mailings must be examined within the context of the scheme. *See United States v. Draiman*, 784 F.2d 248, 252 (7th Cir. 1986). Here, the scheme did not end when the members signed the membership documents at WNT. The goal of the scheme was to obtain money from WNT members and the members did not make full payment of the fees owed to WNT at the time they signed the membership documents. Rather, each victim that testified at trial explained that WNT charged him or her a $125 application fee at the time the agreement was signed, plus a fee in the range of $5,000 to $10,000 depending on the balance left on the mortgage to be paid over time, *after the documents were signed*, according to an agreed-upon payment plan. *See United States v. Powell*, 576 F.3d 482, 494 (7th Cir. 2009) ("As the object of the scheme to defraud the Historical Society was the money, the actual receipt of the funds into Harris's trust account was an essential part of the scheme."); *Seward*, 272 F.3d at 836 (because scheme was not limited to initial withdrawals of money from victim's account, the jury could have found that the mailing sent seven months after such withdrawals and seeking to defraud victim's estate of any remaining assets through a forged will was made "in furtherance of the scheme").

For example, Ramirez testified that WNT charged him $125 membership fee plus $7,500 based on the balance of his mortgage, that at the time he signed the agreement with WNT he paid only what he was able (approximately $1,000), that he agreed to make subsequent payments according to a payment plan as WNT began working on his behalf, and that he thereafter worked extra hours at his second job and skipped payments on other bills in order to pay WNT according to that payment plan. (Dkt. 409 at 674:6–675:22; 691:14–22; 709:4–5). Similarly, Gonzalez testified that WNT charged her $125 plus $5,000 in fees, that she was only able to pay the $125 and half of the $5,000 fee at the time she signed the membership paperwork in September 2012, and that she paid the remaining $2,500 in several additional payments over the next five months: $500 on October 10, 2012, $300 on November 8, 2012, $900 on February 1, 2013, and $1,200 on February 8, 2013. (*Id.* at 1036:13–1037:1; 1040:17–1041:6; 1045:9–18; 1046:14–20; 1047:5–12); *see also, e.g., id.* at 941:16–942:23 (Lopez agreed to pay $5,000 fee in two payments, one-half at the time he became a member and the remainder at a later date); *id.* at 1015:17–23 (Tapia paid $125 at the time he became a member and $7,500 in two later payments).

The evidence also showed that WNT continued to rely on its members *after* they signed the initial agreement because, as part of the scheme, WNT offered to pay members to refer friends and/or family to WNT for foreclosure assistance. (*See id.* at 709: 6–11; 879:3–7). Additionally, WNT told each member that it would take three to four months *after* signing the agreement to complete the process of purchasing and restructuring the new loan and, if WNT failed to acquire the mortgage within that time frame, he or she would receive a refund. (*See, e.g., id*. at 706: 9–13; 834:11–14; 948:20–25; 1016:3–7). WNT then kept in contact with and reassured members that it was working on their cases for months after the membership documents were signed. (*See, e.g. id.* at 7949:3–13 (Government: "And, in total, how many more times did you meet with her

in person after you became a member?" Lopez: "About two, three, I think, afterwards." Government: "And during those meetings, did you ask Ms. Hernandez or notify her that your bank was threatening to foreclose on your shop?" Lopez: "Yes, I commented that to her. I even took her one of the letters. . . She said not to worry, that they were already working with the original bank as to that situation."); *id.* at 1019:15–1020:4 (Government: "And when you spoke to Ms. Hernandez on the phone, did you tell her what was happening with your property?" Tapia: "Yes . . . [She said] that it was in process of being worked on, that her company was doing what was possible to stop.")).

Therefore, there was ample evidence for the jury to find the scheme ended before the mailings were sent, when a member signed the membership documents and paid the initial application fee. At any point thereafter, a member could stop making payments to WNT, stop referring new members, warn potential new members not to work with WNT, or demand a refund. A reasonable jury could find that the success of the scheme depended on WNT continuing a good relationship with its members and avoiding detection for as long as possible and that the mailings contributed to this goal. *See Schmuck*, 489 U.S. at 711–12 ("Thus, Schmuck's was not a 'one-shot' operation . . . [but] an ongoing fraudulent venture. A rational jury could have concluded that the success of [the] venture depended upon his continued harmonious relations with, and good reputation among, retail dealers, which in turn required the smooth flow of cars from the dealers to their Wisconsin customers."); *see also United States v. Bell*, No. 13 CR 949, 2019 WL 366890 (N.D. Ill. Jan. 30, 2019) (denying co-defendant Monica Hernandez's motion for a judgment of acquittal based in part on the same grounds raised here).

Because there is ample evidence to support the jury's verdict, Bell is not entitled to a judgment of acquittal under Rule 29.

## **CONCLUSION**

For the reasons stated above, Defendant Bell's Motion for Judgment of Acquittal (Dkt. 476) is denied.

_____
Hon. Virginia M. Kendall
United States District Judge

Date: July 2, 2019